826 F.2d 214
 Claire APPELMANS and Tara Broderick, Appellants,
v.
The CITY OF PHILADELPHIA, the Philadelphia City Council,
Mayor Wilson Goode, Director of Finance, Richard C. Gilmore,
the Philadelphia Gas Commission, and Gas Commissioners,
Joseph Vignola, John Street, Ann Land, Lawrence Reaves and
Charlotte Nichols.
 No. 86-1583.
 United States Court of Appeals,
Third Circuit.
 Argued March 18, 1987.
Decided Aug. 12, 1987.
 
 Timothy B. Broderick (argued), Philadelphia, Pa., for appellants.
 Handsel B. Minyard, City Sol., Gerald T. Clark (argued), Deputy City Sol., City of Philadelphia Law Dept., Philadelphia, Pa., for appellees.
 Before HIGGINBOTHAM, MANSMANN, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 This class action under 42 U.S.C. Sec. 1983 against the City of Philadelphia was instituted by residents of Philadelphia who are consumers of gas purchased from the Philadelphia Gas Works ("PGW"). The plaintiffs alleged that the transfer of $6.5 million from the PGW's sinking fund reserve to the General Fund of the City of Philadelphia constituted a special assessment against them and was violative of their rights under the equal protection clause of the 14th Amendment, a taking of property without just compensation in violation of the 5th Amendment and was violative of Pennsylvania's law of municipal utilities. The district court entered summary judgment for the defendant City of Philadelphia, finding that the plaintiffs had failed to state a cause of action under Sec. 1983 in that the transfer of funds does not constitute a special assessment. After de novo review, we find no evidentiary materials of record to support the assertion that the appellants have a protectible property interest in the funds at issue here. Therefore, we will affirm the grant of summary judgment for the defendants.
 
 I.
 
 2
 The Philadelphia Gas Works is a facility for the manufacture and distribution of gas owned by the City of Philadelphia and managed by the Philadelphia Facilities Management Corporation. The Gas Works is regulated by the Philadelphia Gas Commission, a five member body including the City Controller, two members appointed by the City Council, and two members appointed by the Mayor.
 
 
 3
 The First Class City Revenue Bond Act of 1972 authorizes cities to incur increased debt for the purpose of financing or refunding the cost of their ordinary revenue producing enterprises or "projects" without pledging the general credit or the taxing power of the city itself. 53 Pa.S. Sec. 15901 et. seq. This may be accomplished by issuing bonds secured only by project revenues. 53 Pa.S. Sec. 15902. Project revenues which may be used to secure the bonds are defined generally as receipts from charges to the general public, payments under bulk contracts, and government subsidies. 53 Pa.S. Sec. 15902. Project revenues may also include estimated interest and profits from investment of the foregoing. Id.
 
 
 4
 The statute requires the establishment and maintenace of a sinking fund for payment of principal and interest on the bonds. 53 Pa.S. Sec. 15909. Interest and profit from investment of the sinking fund may be added to the fund as required to service the debt, and any excess "shall be repaid to the city for its general purposes or applied as may be provided in the bond ordinance." Id.
 
 
 5
 In 1975, the City of Philadelphia, pursuant to 53 Pa.S. Sec. 15901, enacted the General Gas Works Revenue Bond Ordinance, which authorized the issuance of gas works revenue bonds of the city, to be secured by a pledge of revenues of the Gas Works. City Council Bill 1872. The city ordinance established a sinking fund from pledged revenues of the Gas Works. Id., Section 6.01. The ordinance also established a sinking fund reserve from proceeds of the bond sales. Id., Section 6.04. Deficiencies in the sinking fund were to be restored from the sinking fund reserve. Id. Deficiencies in the sinking fund reserve were to be restored by deposits from the pledged revenues of the Gas Works. Id., Sections 6.04 and 7.02. Any excess income generated by either fund was to be "repaid" to the city.[1] Id., Section 6.03.
 
 
 6
 On November 12, 1985 the Gas Commission approved the transfer of $6.5 million from the Gas Works' sinking fund reserve to the General Fund of the City of Philadelphia. As a result of this order, two separate lawsuits were filed: a state court appeal by a group representing all gas rate payers[2] and this suit filed by Appelmans and Broderick, the appellants, in the United States District Court for the Eastern District of Pennsylvania. The relief sought by the appellants included an order enjoining the transfer of funds or restraining the use of the funds as part of the City's General Fund.
 
 
 7
 The defendants moved to dismiss plaintiffs' complaint, and the plaintiffs moved for summary judgment. The district court then treated the defendants' motion to dismiss as one for summary judgment in accordance with Fed.R.Civ.P. 12(c) and granted the defendants' motion.
 
 
 8
 The district court considered the proffered evidentiary materials and found that the plaintiff consumers had no cause of action based on the facts alleged and offered to be proved. The court found nothing of record to support the assertion that the transferred funds were "revenues" of a municipal corporation. Therefore no cause of action could be supported on the asserted legal theory that revenues of a municipal corporation are for the benefit of its consumers and may not be taken for the general municipal fund. The court also found that the plaintiffs had introduced nothing to support the allegation that the transfer of funds created a deficiency in Gas Works revenues necessitating an increase in gas prices operating as an indirect asssessment against the property of the gas consumers. Finally, the court found the transfer to be plainly authorized under state law. The district court denied the plaintiffs' motion for summary judgment and granted summary judgment for the defendant. This appeal followed.
 
 
 9
 Our review of a motion for summary judgment is plenary. An appellate court is required to apply the same test the district court should have utilized initially. Inferences to be drawn from the underlying facts contained in the evidence submitted to the district court must be viewed in the light most favorable to the non-moving party. See Goodman v. Mead Johnson & Co., 534 F.2d 566 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). This standard does not change when the issue is presented in the context of cross-motions for summary judgment.
 
 
 10
 "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 
 11
 We agree with the district court that the plaintiffs have failed to state a cause of action under 42 U.S.C. Sec. 1983. The plaintiffs have failed to allege or provide evidentiary support for their legal entitlement to the funds at issue giving them standing to object to the transfer.
 
 II.
 
 12
 We interpret appellants' argument to be that Pennsylvania law requires that the earnings of a municipal utility be retained and applied to fund the internal operations of the utility. If the funds had been retained, rates either would have been reduced or at least would not have been raised. Therefore the direct taking of the funds for the city's general fund amounted to an indirect tax on gas consumers in the form of higher rates. The result is that the property of the gas consumers is being taken in the form of higher rates and that gas consumers are forced to assume an unequal burden of taxation amounting to a taking without just compensation and violation of equal protection of the laws.
 
 
 13
 We need not consider whether there may have been a taking or an unreasonable classification unless the plaintiffs can show a property right or vested interest in the funds at issue which is adversely affected by the defendant's action. See generally, O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Common Cause v. Department of Energy, 702 F.2d 245 (D.C.Cir.1983). In order to sustain a claimed denial of a federal constitutional right through the use of the funds at issue, the plaintiffs must establish more than a hope or unilateral expectation that the funds would be used for rate reduction. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). They must establish a legal interest in or entitlement to those funds and a real or immediate injury or threat of injury which is likely to be redressed in a tangible way by available judicial relief. Id. Property interests are created by "existing rules or understandings that stem from an independent source such as state law." Id.
 
 
 14
 The appellants contend that the district court erred in failing to find that the gas consumers have a constitutionally protected property interest in the transferred funds. They argue that under Shirk v. Lancaster City, 313 Pa. 158, 173, 169 A. 557 (1933), they have a property right in the fund at issue. In Shirk a citizen and water consumer sued to enjoin the City of Lancaster from imposition and collection of water rates which resulted in a profit to the municipal corporation. The Pennsylvania Supreme Court held that a municipal utility may legally make a profit, that the purpose for which any profits of a municipal utility are used is within the sound discretion of the municipal authorities, and that this discretion will not be interfered with unless it is abused.
 
 
 15
 The Shirk court, in dicta, admonished municipal authorities that "profits should not be used to create manifest preference or discrimination among other taxpayers," id. at 174, 169 A. 557 and that "[g]overnmental expenses may be paid from the residue unless it manifestly prejudices a portion of the taxpayers." Id. at 175, 169 A. 557.
 
 
 16
 The appellants argue that the admonition in Shirk not to discriminate among taxpayers in the use of profits prohibits a municipal-operated utility from setting rates for its services that are designed to support other services provided by the municipality. They argue, therefore, that Pennsylvania law mandates that net revenues of the utility be applied to fund the operations of the utility, and that this requirement amounts to a property interest of gas consumers in the net revenues.
 
 
 17
 The appellants insist that an issue of fact remains as to whether the $6.5 million in transferred funds are the economic and/or legal equivalent of profits, earnings or revenues. They contend that the same use restriction would apply to proceeds from a revenue bond sale as they argue applies to other earnings, and that the district court's reliance on a distinction between the Gas Works' revenues and excess earnings from a sinking fund reserve is irrelevant as a matter of law in determining whether the transfer constituted a special assessment against them. The appellants argue that the transfer of the sinking fund earnings into the general fund manifestly prejudices the taxpayers who are also consumers of gas because the funds could have been applied to effect a rate reduction. These contentions are without merit.
 
 
 18
 An assumption arguendo that gas consumers have a property interest in funds acquired from them in the form of rates does not lead to the conclusion that they have a similar interest in invested funds acquired from another source. There is no evidence that the funds were generated or replaced from receipts on the sale of gas to consumers. In oral argument before this court, it was uncontroverted that the $6.5 million was not the result of payments made by the gas consumers, but was excess interest on invested monies of the sinking fund reserve. The reserve was funded from proceeds of the bond sale. Therefore, the money was originally the property of the purchasers of the bonds. Since the transferred funds are not derived from payments by gas customers or from earnings on such revenues, there is no direct nexus between the ratepayers and the excess earnings at issue which could arguably support a property interest in the ratepayers.
 
 
 19
 Additionally, the appellants have introduced nothing to evidence a protectible interest as a result of any legal requirement that the funds be applied toward a rate reduction or even toward the internal operation of the Gas Works. The appellants argue that George v. City of Asheville, 80 F.2d 50 (4th Cir.1935), supports their assertion that they have a property right in the interest on the bond proceeds. However, George lends no support to appellants' position. George does not hold, as the appellants suggest, that the interest on the proceeds of a revenue bond sale must be applied to fund the operations of the utility. It holds instead that net revenues derived from the operation of the utility must first be applied to service the debt on bonds for which the revenues are pledged. In addition, George was decided on the basis of a North Carolina state statute which clearly is inapplicable here. The appellants have cited no comparable Pennsylvania case or statute prohibiting the city from transferring revenues of a city owned utility into the general fund. In fact, both Shirk and the bond act specifically recognize the right of the city to use the excess interest for its general purposes.
 
 
 20
 In testimony before the district court during a preliminary injunction hearing Joseph C. Vignola, the Comptroller of the City of Philadelphia and chairperson of the Gas Commission, testified that the $6.5 million, had it not been transferred to the general fund, would have remained as retained earnings for the Gas Works but would not have created an immediate reduction in the gas rate. He testified that in his opinion a rate increase would be necessary in the future because the transferred funds were no longer available.
 
 
 21
 Although common sense would suggest that retention of the funds might have resulted in lower rates for consumers of gas, the appellants have failed to introduce anything to suggest any legal entitlement to have the funds applied for that purpose. The interest was not the property of the appellants originally and did not become the property of the appellants merely because it could have contributed to a rate reduction if it had remained in the general fund. The plaintiffs have proffered nothing to show that if the court granted the relief requested, i.e., rescission of the transfer, the plaintiffs would benefit from lower rates.
 
 
 22
 We agree with the district court that because nothing of record evidences the appellants' entitlement to the funds at issue, the defendants are entitled to judgment as a matter of law. Accordingly, the judgment of the district court will be affirmed.
 
 
 
 [1]
 Pursuant to section 4.02, project revenues are to be applied as follows:
 ... first, to Net Operating Expenses; second, to required payments to the sinking fund herein created to pay the principal of and interest on all Bonds issued hereunder and if required to accumulate or to restore any deficiency in, the Sinking Fund Reserve; third, to the payment of any general obligation bonds adjudged to be self-liquidating on the basis of such expected revenues; fourth, to the payment of interest and sinking fund charges of other general obligation debt incurred from the Gas Works, and fifth, to the payment of City charges. Any balance remaining may be applied to any proper purpose of the City ... (emphasis added).
 Pursuant to a supplemental ordinance (Bill 2068, June 26, 1975), specific provisions were made governing the transfer of any remaining balance. Section 6 of the bill provides that:
 All interest and income earned on moneys held in the Gas Works Revenue Bond Sinking Fund Reserve created under the General Ordinance (Sinking Fund Reserve Earnings) shall, to the extent not required to comply with Section 6.04 of the General Ordinances, be transferred and paid by the Sinking Fund Depository to the operating funds of the Gas Works to be applied as Project Revenues in accordance with the terms of Section 4.02 of the general Ordinance. To the extent that in any fiscal year balance remains in the Project Revenues, including Sinking Fund Reserve Earnings, as such balance is determined in accordance with Section 4.02 of the General ordinance, such balance, upon the approval of the Gas Commission may be paid to the City, provided that in a given fiscal year the balance so paid does not exceed the amount of Sinking Fund Reserve Earnings transferred and paid to the operating funds during the same fiscal year....
 (Emphasis added.)
 The result of these provisions is to permit income generated by the investment of sinking fund reserve monies to be transferred to the City if two conditions are met. First, the amount generated must exceed the amounts required to fund the accounts required by Sec. 6.04 and Sec. 4.02. Second, the amount transferred must not exceed the amount received by the operating funds of the Gas Works from the same excess earnings.
 
 
 [2]
 The decision in the state court was that the transfer payment was authorized pursuant to the laws of Pennsylvania and Philadelphia